Good morning, Your Honors. My name is Ken Harper. May it please the Court, I'm here on behalf of the Yakima County Appellants in this matter. Your Honor, this case presents to the Court a consideration of whether a Fourth Amendment seizure analysis shares commonality with something that is perhaps more akin to Fourteenth Amendment substantive process concerns. The basic premise of the trial court below, I think, was that Fourth Amendment analysis could be viewed as a continuing event by which a number of different factors could be taken into account to locate whether or not there was, in fact, a seizure. This was error. This was error as a matter of law, which this Court reviews de novo. In fact, Your Honors, the basic premise that the trial court relied upon, this sense of a series of events leading to a seizure, was fundamentally wrong because this Court's jurisprudence and jurisprudence of the United States Supreme Court makes clear that there cannot be a seizure unless there was a termination of movement through a means that was intentionally employed to achieve that purpose. And in fact, in the record before the trial court, there was nothing the trial court pointed to that constituted an instrumentality put into effect to accomplish a seizure. Counsel, that's all very theoretical. But let's talk about the facts of this case. So in this case, the question in my mind is whether or not Mr. Sanchez Ochoa would be free to leave once the State charges had been resolved. There's no dispute that he would have been. There's no dispute. There is nothing in the record that suggests that he would not have been free to leave when the State court charges were resolved. So what was the effect, if any, of the immigration hold? That's a very good question, Your Honor. Thank you. The purpose of the immigration hold or the administrative warrant, and I think this is... Well, it was listed as an immigration hold. Very good, Your Honor. And I will certainly concede that that's what the Yakima Department of Corrections website describes it as, as a matter of listing it. The purpose of it, Your Honor, I think quite simply was it was a means of confirming to anyone who looked onto the Yakima County Department of Corrections website, in conjunction with Mr. Sanchez Ochoa's actual offenses, that there was also this other warrant, if you will. I mean, that is what the I-200 stands for. There was this other warrant that existed that related to Mr. Sanchez Ochoa. And the record shows that the county would have had exactly the same manner of disclosing a warrant from any other jurisdiction that might have had a warrant or a hold on Mr. Sanchez Ochoa. Now, that's all the record shows on that. And that's different from describing an event that constituted some sort of intentional acquisition of physical control. So how does the district court bridge this? And this is, I think, really not so theoretical, and I hope it's not. I hope it addresses Your Honor's question. The way the district court bridges that is it looks to the causal sequence. And you can find this at ER 24. It's really an extraordinary statement, and I think it's precisely the source of what the county claims is error reviewable de novo. In this excerpt, at ER 24, the TRO, and I'm not going to read it at length, but I'll read this brief portion. This is the court states, Sanchez Ochoa has adequately alleged that the immigration hold noted by DOC will result in his continued detention because he cannot post bail. This is sufficient to establish that the immigration hold caused a subsequent seizure for Fourth Amendment purposes. We know that's the extent of the district court's legal analysis because the next page at ER 25, the first sentence is, having found that the immigration hold placed defendants, I'm sorry, hold defendants placed against Sanchez Ochoa caused a subsequent seizure for Fourth Amendment analysis. That's the sum and substance of the court's analysis then at ER 24. If we unpack what that statement is saying, I think it becomes less theoretical and becomes very impactful for Fourth Amendment analysis purposes. The trial court stated that Sanchez Ochoa has adequately alleged that the immigration hold noted by DOC will result in his continued confinement. So we're now separating the justification from the record. What evidence was there of that? Very good question, Your Honor. I can cite to the court at ER 20, and this is a little bit awkward, I think, Your Honor, because, and we make this point in passing in our brief, there are no findings of fact. It's difficult to be clear on this. But at ER 20, Your Honor, the court states, I'm starting at line nine, Sanchez Ochoa has adequately pleaded facts. So again, Your Honor, we're relying on pleadings more so than facts. But nevertheless, to give the court its due, Sanchez Ochoa has adequately pleaded facts with supporting documents to show that defendants were not willing to release him even if he posted bail on his state charges, ECF number 73 at 9, 10, and 16. ECF 73 at 9, 10, and 16 is the letter from Mr. Sanchez Ochoa's legal counsel to the Department of Corrections describing various premises regarding the use of I-200 administrative warrants. I submit, Your Honor, that can't be evidence. But that's what the court cites. Counsel, before you leave that point, may I ask you, would you agree that if this statement were in fact true, that if the county were not willing to release Mr. Sanchez Ochoa even if he posted bail on his state charges, that would be a violation of the Fourth Amendment? Would you agree? It would depend on the reason why, Your Honor. And I think this is what the county views as, and now I'm branching back into the theoretical with apologies, I think this depends on why the county would not release Mr. Sanchez Ochoa if he had posted bail or if he was otherwise scheduled to be released. I think what the contemporary state of the law on the use of detainers in detaining someone who may have a want or a hold against them is fairly clear and it seems to be coalescing. Well, I'm talking about in the context of this case, for this defendant. If the statement is true that for Mr. Sanchez Ochoa, the county would not be willing to release him even if he posted bail on his state charges, with the state of the record as it was, would that be a violation of the Fourth Amendment? Again, Your Honor, I don't know that it would be. I don't know that I can concede it. Why not? Because I don't know that there's a seizure. What was in the record, what was in the record in this case that would justify the county holding Mr. Sanchez Ochoa even if he posted bail on his state charges? Oh, I don't think there's anything in the record that would justify it. That's a very different question. With the state of the record as it was at the time Mr. Sanchez Ochoa was incarcerated, would the county have been willing to release him? If the county were not willing to release him even if he posted bail on his state charges, would that have been a violation of the Fourth Amendment? Okay, Your Honor. Let me specifically answer that question. If the bail had been posted and the county had refused to accept the bail, is that the premise of the court's ruling? If they refused to release him if he posted bail. That's the statement that's made here. Yes, Your Honor. I think that comes to a, frankly, a gray area in Fourth Amendment jurisprudence. I don't think there is a clear case on point that says that prolonged detention through the deprivation of access to bail is a Fourth Amendment violation. No, that's not a deprivation of access to bail. If he's posted a bail already, why would there be a need to keep him? Well, and I don't think there would be, Your Honor, but this is the point of seizure. You're fighting a lot on this question. Your Honor wants to get a clear point, but I don't know that it is clear. I don't know that there is a case that states what Your Honor just posited. I haven't found the case. I understand that it makes tremendous conceptual sense, but the Fourth Amendment is rigid and the Fourth Amendment follows very technical modes of analysis. And as much as I want to be outrageous, that would be a Fourth Amendment violation. But I'm not saying it would be outrageous. I was just wondering if it would be a deprivation of liberty at that point. Ah, that's a different analysis, though, I think, Your Honor. It's a seizure at that point. It's a Fourteenth Amendment substance abuse process violation. Oh, so you want to push it into the Fourteenth Amendment. I think it would be, Your Honor. I think it would be. I can't state that if the county had, I think it would be wrongful. I don't think it exists on this record. It certainly is a portion of what happened in the Miranda-Olivares versus Clackamas County case. In that case, there was not merely a detention beyond Ms. Miranda-Olivares' detention release date. That's clearly a Fourth Amendment violation. I can accept that. But also, to give the appellees their due, in Miranda-Olivares, there was a companion claim. And the companion claim was not merely that Ms. Miranda-Olivares had been held over past her release point, but it was also that the county, Clackamas County, had interfered with her bail. And that Miranda-Olivares interfered with her right to post bail pursuant to the state court's ruling, state court's probable cause finding. And in fact, in that case, the district court acknowledged that would be a Fourth Amendment violation, too. I don't see the distinction you're drawing. Because if someone has posted bail and is nevertheless detained, isn't that a detention past the date when the detainee should be released? Certainly it is, Your Honor. Okay. Isn't it a fair reading of the letter, I think from the sheriff, that bail would need to be posted with the federal court in order for him to be released? Judge Frienthal, thank you for the question. It's hard to know quite what to say in response to that, to be honest with you. The correspondence between Mr. Sanchez-Ochoa's counsel and Department of Corrections Chief Ed Campbell, I think that's the letter you're referring to, Your Honor, they pass each other like ships in the night. We have Sanchez-Ochoa's counsel pointing out that in their perspective, I-200 should not be used, and this is I think keying to Judge Rawlinson's point, I-200 should not be used to hold a detainee over. Pursuant to no other INA justified reason for the county, or no legitimized INA reason for the county, to hold someone over. We don't contend. We had an INA basis to hold this person over. But I-200 should not be used to substitute for an I-247, as it was done in cases from the First and the Third Circuit, and even in Ms. Miranda-Olivares' case. But when that letter is received by Department Director Campbell, his point in response is to say, we're not sure we're speaking about the same thing. We don't think we're using I-200s the way you're complaining about I-247s being used. We're in a dialogue right now with U.S. attorneys. We're in a dialogue with the Prosecuting Attorney's Office. We're in a dialogue with other advocacy groups. We're trying to find a solution to this problem. And what Director Campbell does not really engage with is the rest of counsel's letter. That was the point of the letter, though. I don't know that I understand what the point of the letter was, Your Honor. And that's kind of where I'm, I guess, partly sympathetic with Director Campbell, but also to bring it back to seizure analysis, I don't know what difference it makes. So if I grant Your Honor's point that that's a part of the letter, if I grant that point, what that might imply is that Mr. Sanchez-Ochoa is saying, I'm coming up for a bail hearing later this week. I want you to drop my I-200. And Director Campbell is replying, we're going to look into this, we're going to try to figure this out, but you can bail on your I-200. If you talk to federal courts, you can bail on that. That's just a whiff. I mean, it's not that Director Campbell is saying, we won't grant your state court bail should you post it here. It's Director Campbell, frankly, misunderstanding that federal courts and immigration courts are two different things. And he's trying to suggest that there is a way forward for Mr. Sanchez-Ochoa through his immigration bail process. But in the hindsight that we have now, Mr. Campbell did not responsibly address the question that, and I will grant that, he did not responsibly address the question that the counsel's letter raised. That doesn't turn into a seizure. That's no more an instrumentality to accomplish a detention through a means set forth for that purpose, which is the test. I'm kind of wobbling back and forth between theoretical and practical and actual. To your honor, so please help me. So let me, so there's this exchange of letters, and it does appear to be that this is the evidence cited by the district court in making the statement. So let me see if I can refocus. Did a time ever come when Mr. Sanchez posted bail on his state charge? It did not, your honor, until the TRO was granted. The TRO was granted, and within three days after that, I believe, Mr. Sanchez-Ochoa arrived at the jail, I'm sorry, bail arrived at the jail, and Mr. Sanchez-Ochoa was processed for release. He was released directly into the hands of ICE agents who picked him up and detained him. If he had posted his bond, and now we're back into theoretical. But I'm trying to figure out how this would have played out. I mean, would it have been the same thing that happened afterwards? Would that have happened before? I mean, would he have been released into whichever agency it would be? I guess ICE. Has the TRO changed anything? It's a great question, your honor. I don't know what it changed. I mean, it changed- I mean, we're fighting about something. Well, okay, let me disengage what I just said. I don't know what it changed in terms of Mr. Sanchez-Ochoa's rights to post bail. I mean, he had the right to post bail. The premise- And that would satisfy, as far as Yakima County Jail is concerned, he can leave. He's not being held on state charges anymore once he bails out. And I take it you don't take responsibility for what happens to him after ICE takes him into custody. We don't believe we do. That's correct, your honor. Kind of piggybacking on Judge Clifton's question, in the absence of the TRO- Yes, your honor. Would the county officials have accepted bail? Yes, your honor. Okay. Yes, your honor. The declaration of Mr. Himes- So then we disregard the sheriff's letter saying that the bail had to be posted with the feds? Your honor, I think so. I think so. Again, the way the district court gets to seizure analysis, and I know I keep coming back to that, but that's what the Fourth Amendment is all about. The way the district court gets to seizure analysis places heavy emphasis on the letter from Department of Corrections Chief. And I just don't see how that comes any closer to an actual seizure event. And you take his comment to be really commuting, not doing a favor, but saying, in the next stage, which we're not responsible for, it turns out you can bail on an ICE hold, but that's not our department, we can't help you with that. So you don't think his comment is trying to tell them, we won't let him go unless he gets this bail from the federal court? It doesn't say that. It doesn't say that. And the only evidence in the record that has direct bearing on that, Judge Clifton, is the uncontested declarations of Department of Corrections staff stating that, and furthermore, it's not just the declarations, but you go deeper into the record, there are a couple of emails where the Department of Corrections is stating that if someone presents an I-247 detainer, we will not hold them. If someone presents an I-200, we will not hold them unless there is also a request from the ICE officer to transfer that person into ICE custody. And if there is such a request, then we get into this interpretation of the interlocal agreement that can lead to someone's going from DOC custody into ICE custody. Your Honor, I think you want to ask me a question, but I do want to reserve some time, so I'll certainly take your question. One quick question. Yes. And just to make sure I haven't gotten confused, does the county hold any ICE detainees by contract? I mean, there are a lot of state and local facilities. Yes. But he's not involved in any of that? He was never transferred into, that's correct, Your Honor. Counsel, I hate to take your time, but procedurally, we are reviewing a TRO, so our discretion and our discretionary review is very limited. How does that play into what you're asking us to do? Thank you, Your Honor, for the standard review question. I understood from this morning's presentations that court takes standard review very seriously. Your Honor, the TRO may be reviewed for abuse of discretion in terms of its general scope, but as to the legal basis of it, review is de novo. Okay. All right. We'll hear from the government. Thank you, Your Honor. May it please the Court. I'm Scott Stewart on behalf of the United States. I think I may just follow up directly before kind of proceeding into the overall argument and answering other questions with how to interpret that paragraph of Director Campbell's letter. I think in the context of the record as a whole, I think it's pretty clear that what was being referred to there, and perhaps slightly inartfully, is once we release somebody, he can still get bail somehow in the immigration system, but we at the county level don't accept that bail. We're not involved in that. That's a matter for the Federal Administrative Immigration Courts, and you'll have to talk to the folks at DHS or ICE to sort of hammer out how that's going to go. That's the best way to read. Counsel, was the court compelled to read the letter that way? In light of the other evidence in the record, yes, Your Honor. And I'd emphasize that although this purported to be a factual determination, it's a matter of just reading the letter and the few other declarations that bear on the issue. If it's not a factual determination, what is it? It is a factual determination, Your Honor, but it's easier to find that this was under any standard, including a clear error standard, a clear error to conclude that the county would not release Mr. Sanchez Ochoa on bail if he were to post bond on his state charges. In paragraph 7 of Chief Himes' letter states that unequivocally, even the bail bond company owner, a declaration submitted by my friends on the other side, said, look, my understanding is that what happens here is that at one point he says folks won't be released or they won't be released. He clarifies that in paragraph 6 of his declaration to say what happens is when folks are released on state charges, and I can point the court to the precise point in the excerpts, this is excerpts of record page 246, paragraph 6, where Mr. Izquierdo says what happens when somebody bonds out on state charges and is released on state charges is they're passed over to immigration, immigration authorities, ICE, who then will take them to the Tacoma County facility to sort of follow up with whatever the immigration proceedings are going to be. So given the clear statement that yes, we would bond out, we the county, the county would bond out Mr. Sanchez if he posted bail, that statement by that declarant, and the fair reading of the, and the clearly correct reading of the letter, those facts together I think pretty clearly show that the county would accept bail. To be sure, you know, there was a likelihood given the strong federal interest in picking up and pursuing immigration proceedings that he would, in accordance with notification procedures and valid federal arrest authority, would be picked up. But it's pretty clear, I think, and the district court was wrong to conclude otherwise, that Mr. Sanchez Ochoa would be released if he posted bond. So just hitting that as a first issue, moving in sort of to the key kind of critical issue that the United States devotes most of its attention to in the brief, Your Honor, is just our fundamental position that there was no Fourth Amendment seizure here in any, there was no new Fourth Amendment seizure as a result of the posting of the administrative warrant. Mr. Sanchez Ochoa was detained at the time on valid, probable cause-based state law charges. There's no dispute that he got the process entitled to him for those state law charges, that they validly led him to be detained. When was there a new seizure? Was there a new seizure, you acknowledge there was a new seizure at the time after the TRO, it turns out, but he was released from, on bail from the jail on state charges, excuse me, and then taken into custody by immigration authorities. Was that a new seizure? That was a new seizure, Your Honor, and that required its own justification to be consistent with the Fourth Amendment. And here, as I believe you'll see it a number of times in the transcript in the court below, as the other side conceded, that ICE agents can validly execute that, or, you know, there is a basis by which ICE can act and arrest that person. So the basis for that subsequent seizure is the probable cause-based, probable cause-removability-based administrative warrant. Is the fact that somebody's kind of backing up, you know he's there, why isn't, why shouldn't responsibility be taken for the effect of that in terms of, I mean, the bondsman says he can't get out because we won't post a bond because we know he's just going to be taken in by immigration. Isn't that a reality? It is a reality on this record, Your Honor, that bail bonds, bail bonds providers in the exercise of their business judgment do make that determination that it doesn't make good business sense to provide bond for people who are likely to be taken into further custody. You could imagine the same being true for, say, you know, federal, just FBI agents taking in somebody for some kind of a different federal crime. But that's a reality and it's a different independent decision by a third-party actor. The key thing I'd emphasize there, and this is something that's been hit in just a good number of Supreme Court and this Court's cases as well, the Al-Nasser case in this Court, the Brower case in the Supreme Court, that you need to have a Fourth Amendment, some intentional use to, an intentional, means intentionally applied, a willful restraint, something that is, and something that isn't only intentional and willful, but something that's designed to seize the person who is claiming to be seized. It's not enough that something happens in a but-for sense that causes somebody to, you know, continue their confinement or, in the case of Al-Nasser, to stop and, you know, be, you know, kind of before and not moving, you know, when in the face of a law enforcement agent. Counsel, would there have been a subsequent seizure if the county officials had refused to release Mr. Sanchez Ochoa after he presented his bond? Would that have been a subsequent seizure? There would be a subsequent seizure requiring, you know, its own, you know, independent basis to be justified, Your Honor. Right. And our position, we don't, we haven't gotten there in this case because of the way it played out. Our position, we differ a bit from the county on this, and it's, again, something that is not sort of ripe, so to speak, for resolution. But our position is that, at least, and this gets into kind of the detainer context, you know, when federal authorities have made a probable cause determination of removability and has embodied that, embodied that determination in an administrative warrant and have asked somebody at the local or state level to hold somebody briefly, 48 hours is where we, you know, where we cap it, that is a justifiable Fourth Amendment seizure. That sort of brief seizure is consistent with the Fourth Amendment and provides an adequate basis for it. So it's your position that the immigration hold would have been sufficient for 48 hours to justify continued detention? Well, Your Honor, the reason we don't, we didn't get that in here is that, you know, at least as this was adjudicated in the district court, we hadn't asked for detention. We just asked for notification and say, hey, let us know, you know, when you're released. That's why we don't really get into the detention issue because, you know, some, some localities and states will help us out in that way by, by detaining briefly in response to requests. The county here did not have that approach, but they would, you know, give us a heads up so that, you know, we could deploy our, you know, our few agents that we have to show up at the right time to then take custody under, under valid authority. The concern that I have with this case is this, is this immigration hold? And it seems to, that being in this theoretical world about, well, if, the reality was, is he couldn't post bail and they couldn't provide the cash either. I think it's unrealistic to expect that. And so we've got an entity putting an immigration hold on, why? I don't understand that. And that, and that does seem to be the reason why he wasn't released until the judge ordered it under the TRO. Sure. Let me see if I can, I can try to address, address that, that concern, Your Honor. I think sort of two issues. One at the time, you know, there is an adequate basis for him to be detained because of the state law charges. You're getting at the, you know, the sort of de facto decisions sort of down the line. The point I'd emphasize there is that, you know, for a Fourth Amendment problem anyway, the key thing is, you know, is the government misusing or abusing its power? That's what the Supreme Court said in Brouwer, you know, is there something really bad here? That's not what we have here. We have sort of a, you know, look, we have this notification system. We want to make sure people, you know, know, you know, what the issue is with somebody who's going to be released, how we're going to cooperate with federal authorities, that kind of a thing. But doesn't that trivialize the actual impact of that notice? I don't, I don't think so, Your Honor. I'm speaking to the Fourth Amendment question about, you know, a means intentionally applied. And the point I'd emphasize is that all we have here is a Fourth Amendment claim, as we've noted in our brief. You know, maybe there's another, you know, another ground to try to claim here, you know, an excessive I wouldn't endorse any of them, but for the one claim we have that on which the district court granted the relief here, it is the Fourth Amendment claim, which requires a very tight causal nexus where the government is intentionally and willfully deploying its powers in a way that's designed to seize a person. And when the county just posted the objectively correct fact of an immigration warrant here, which in turn caused independent actors to make I ask that the court reverse the injunction. And I thank the court for giving the United States leave to be here today. You're welcome. Thank you, counsel. We'll hear from counsel for Mr. Sanchez-Ochoa. Good morning. May it please the court. Matt Adams on behalf of Mr. Sanchez. With respect to the current status of the case, I think it's really important to emphasize that this was an appeal of a temporary restraining order. And in fact, we believe that the appeal is moot, given not only that the order forced the county to withdraw the hold, the bell was then placed and paid and he was released. But in fact, subsequent to the briefing, the criminal case was concluded. And in fact, Mr. Sanchez was then deported to Mexico. Are you telling us the case is moot? I am not telling you the case is moot, but that the appeal of the temporary restraining order is moot. The case is certainly ready to proceed forward onto the merits to determine whether Mr. Sanchez is entitled to damages, to determine whether he is entitled to damages. Should we vacate the temporary restraining order? I'm sorry? Are you saying we should vacate the temporary restraining order? I don't think so. Under this court's case law, you can't have it both ways. I mean, if the case is moot, then there's no reason for it to stay in place. If you want it to stay in place, then how is it moot? Because the court is not in a position to undo the action that was enjoined by the district court. They can no longer take an action that will have an effect on the temporary restraining order that was provided. And in addition, the temporary restraining order doesn't have an impact on any future actions. And for those two reasons So it's not moot? I mean, I'm not trying to be difficult here. I simply do not understand how you can tell us it doesn't matter anymore, but it matters. I don't believe it matters. I believe that if the court Then why don't we just dispose of it and be done with it and save ourselves the next 20 minutes? If the court were to find that it is moot and that it therefore requires that it be vacated as moot, we certainly would not be opposed to that. But what I think is that the plaintiff's appeal of the temporary restraining order is inappropriate, specifically because there's nothing that this court can do that would impact the relief that was provided. And the restraining order, in addition, does not Well, it doesn't sound like there was any, I mean, it's a question I pose to your colleagues across the aisle. What difference does it make? And the answer appears to be it didn't make any difference then, and now you're telling me it doesn't make any difference now? It doesn't make any difference now, but it made a world of difference then. Well, he went from the jail to ICE custody. That is correct. And he had the opportunity then to go before, directly before the immigration judge and seek a bond. If he had not been able to post bail, he would have been stuck months on end in Yakima County before he was then transferred before the immigration court and could seek any bond on that detention decision. But why couldn't he have posted bail in the same way that he did after the TRO before? Because all the evidence I found suggested that the county would have recognized it if he'd come in and posted his bond. Well, let me point you to the evidence that Judge Mendoza relied on. And it was not The TRO cites to pleadings, so I'm looking for evidence. That is correct. But the TRO cites to pleadings and allegations and supporting documents. And those supporting documents that the court looked at, let us not so blithely ignore the very first thing, which is the immigration hold that was listed as a cause of confinement on the jail register. The state of Washington requires the county to list the names of all detainees and the cause of confinement. And what we had was defendants listing an immigration hold as a cause of confinement with no bail available. Now, this is not just in the abstract, but instead we have a policy and practice going back to 2014, which is in the record. We looked at the email. The portrayal of that email, I think, is very different than what it says. In 2014, after the Clackamas decision, the county issued an email saying they were no longer going to honor detainers. But then they issued a follow-up email, and that's on page 188 of the record. And it says, Staff, as I explained in the recent past, we will not be accepting any ICE detainers, I-247 forms, to hold inmates. They have to have an ICE warrant, I-200, to be able to be put into ICE custody at the completion of their local charges. So it wasn't just the hold listed on the jail register, there was a clear policy and practice. And then we had our own exchange, written exchange, with the defendants in which they stated that they would not be able to post bail at the court. And all of this, all of this are the facts that the judge can look at. Well, let me, then point me to that. Okay. I mean, let's, let's, let me start with something simpler. Did your client seek to post bail before the TRO? Our client did not attempt to go to the courthouse before the TRO, no, to post bail. Okay. So we're in, we're into theory here. What was it that, that deterred him from doing that? So, and, and I would say it's not theory, because his counsel had already communicated with defendants to, to ask that he be able . . . Well, the counsel made that statement, and, and that appears to be what the district court cited, but I'm not sure that qualifies as evidence, unless you can tell me what it was counsel based that statement on, and ideally that's in the record. It is. We pointed to the 2014 email that lays out the practice that was in existence at that time, and that email saying that they honored I-200s for immigration holds. And then the letter itself doesn't say anything. Let me just cite to Defendant Campbell's letter, said, related to another issue in your letter, you stated that Mr. Sanchez will not be eligible for bail if he has an ICE hold, and that he currently has a bail hearing on a state charge set for Friday. We have confirmed that Mr. Sanchez can bail on his ICE hold. Unfortunately, we do not accept bail here at Yakima County Jail. And I would note that this is in the . . . Isn't that correct? No, the, it's, well, unfortunately it is correct, because county didn't accept bail payments. It can't on an ICE hold, it can't bail on immigration charges. But there was no ICE hold other than what the county itself had placed upon him. He was not in the custody of ICE, and that is the key factor here. It was Yakima County who had him in custody, who listed the causes of confinement, and were in charge of whether he would be released or not. They can't speculate about what might happen in the future. We've never contended that DHS could not take him into custody, and if so, he would then have to interact with DHS to obtain his release. But when he's in the custody of Yakima County, Yakima County had the responsibility to honor the bail amount that the duly appointed state court judge had issued. And again, we go back to the posture of this case. At this stage, we are looking at whether the district court judge applied the correct legal rule, and if so, of applying that, if his conclusions are logical, implausible, or not supported by inferences from facts in the record. There are ample facts in the record to support the conclusions that he's made. And it's not just these forms of evidence we point out. Look at the declarations that defendants themselves have issued, which demonstrate that on many occasions, they do not release individuals pursuant or as a result of the holds that have been issued against them. And I want to cite the declaration both from the federal government that they submitted as well as the declaration from the defendants. So let's turn first to page 192 of the administrative record. And there we have the ICE officer's declaration. And we heard a snippet of that early on. But let's go keep on reading that down to paragraph 11, and it could not be more clear. It says, when Yakima County informs ICE about an alien's release date and time, and ICE is unable to arrive at the jail to take custody immediately upon release, ICE may request that the county hold the alien for a limited period of time pursuant to the administrative warrant as permitted by the IGA. So there we have the federal government acknowledging loud and clear that yes, at times, we do rely upon the county to detain individuals for us. And it's not just the federal government. Let's now turn to Defendant Hines' declaration, which was submitted. What's remarkable about that? I mean, we had cases earlier this week about how it takes an hour for a canine unit to get from one place to another in Montana because it's a big state and so forth. And eastern Washington is the same way. What's surprising about holding on to somebody while you wait for the immigration authorities to show up? We've had the federal government say that they want 48 hours. Well, what's remarkable about that is that the local government does not have the authority to exercise that civil arrest authority. Congress has carefully delineated who has the authority to execute an arrest warrant. Well, in a context where the state of Arizona wants to be aggressive and go beyond what the federal government does, there's no question about that. When the federal government asks the state to hold somebody, I have difficulty understanding how that's in conflict with the Supremacy Clause of the Constitution. They're doing what the federal government asked them to do. It clearly conflicts with the congressional scheme that has been laid out. Congress carefully delineated the manners in which state and local authorities may support and collaborate with federal immigration authorities. Is there anything that you can point me to that says a state or local authority can't do what the federal government affirmatively asks it to do? Yes, I think in looking at the, let me just process your question. I mean, all the cases come out the other way. It's where the states and localities are purporting to act independently. We've got Sheriff Joe down in Phoenix wanting to arrest everybody. That's not this case. And so when they're not at cross purposes, when it's not a local officio who's off on local authority can't respond to what the feds ask them to do. Well, that's where we go back to the statute itself, which it clearly enumerates the situations in which local authorities can, in fact, work with the federal government to enforce immigration laws. And it goes back to basic jurisprudence. Work with or act independently. Work with. Even under the 287G agreements, it's under the instructions and guidance. And then. Well, that's not telling me. That's only after the agency has gone through training and a certification process, which clearly is absent here. No one contends that they've received that training and certification to be authorized to enforce immigration laws. The other exceptions in the act are when there is a mass influx. And the Attorney General, again, creates a written agreement and lays out a very carefully and specified time frame and what the activities will be. Again, that is not at play here. So you've had Congress carefully delineate when local law enforcement officers may exercise civil arrest authority. And this is not one of those occasions. Now, we're not saying any case authority that interprets the statutes in the way you're offering. We haven't had this presented before this court before. But what we do have. We have Posse Comitatus cases, for example, where the whole point is you don't let, in this case, military forces get involved. I don't know anything that supports a similar interpretation of federal statute or the federal constitution that would preclude the federal government from calling upon local authorities. And that's what you're offering up here. And I guess you're now acknowledging there isn't anything that supports that interpretation other than reading from the statute. I don't think it says it that clearly. But I think that there are cases like Melinda's Arpaio, where it says that where a local law enforcement agency extends a detention for immigration purposes, that that is an unlawful seizure because they're not authorized to exercise that federal civil enforcement authority. And similarly, we go back to general jurisprudence on the Fourth Amendment that's saying an arrest without a warrant, without probable cause, violates the Fourth Amendment. And there is no judicial warrant here for the county to rely on. You don't dispute the immigration authorities taking him into custody? No, because Congress has explicitly stated that immigration officials don't need a judicial warrant. They're able to exercise this civil arrest authority through mechanisms that include their own administrative forms to themselves, directed to federal officials. We look at the administrative warrant that's proffered. It was directed to federal officials, and that is in compliance with the statute because the statute authorizes only enumerated federal officials to exercise those arrest powers. Similarly, the implementing regulations lay out a long list of those who are authorized to exercise that arrest warrant. The arrest warrant in and of itself provides no basis for a local law enforcement agency absent a 287G agreement to then arrest an individual. But let's return briefly to, again, the evidence that was before the court that certainly provided the court with inferences, with the ability to make inferences from facts in the record. And one of that, we've talked about the declaration from the federal government. But now let's go to defendant's own declaration. And we turn to page 137 of the records, and this is the declaration of Defendant Himes. And again, in paragraph 11, it says, in some cases where ICE has issued administrative warrants for individuals incarcerated at the Yakima County Jail, the Department of the IGA to effectuate a transfer of custody to ICE upon the completion of criminal sentences on state law charges. Now, they go on to say that this isn't their general practice with respect to people who are posting bail, but they don't disavow that they've done it. And in fact, in the next paragraph, they state that there's a preference for that in-jail custody because they want to conserve resources for ICE. Now, the other point I'd make here is we've had a couple of references in both their arguments and in these declarations to the IGA. What is that? That's a contract for bed space, for, I'm sorry, to rent bed space. But that contract does not provide any independent authority. And in fact, on the plain language of the contract, it says the county can only take an individual upon presentation by federal officers. And so, absent that presentation by federal officers with the credentials that are required as specified in the contract, the county is not in a position to rely upon that IGA to then assert the authority to unilaterally redesignate someone as being in the custody of the federal government. What does that have to do with this plaintiff? What it has to do with this plaintiff is those are the facts that Judge Mendoza had before him. But I'm just, I'm a little behind you, so I'm just now getting to the declaration you pointed to from Mr. Himes. And it says that it's not used. It's in here, where an inmate subject to an administrative warrant is posted bail, such as the plaintiff in this case. It says this type of transfer is generally not used. They don't even disavow that it's always used. Was there any evidence that was used here? The evidence that we have is the record that's already been before, the statement from the county himself, from the chief's declaration. We have the email from the chief to his staff instructing individuals that yes, you may hold folks on I-200s. And in addition, we have the declaration from experienced criminal attorneys. We had the judge talking about his own experience before this court, before he was a federal judge. All of these are inferences that the judge is permitted to make from the facts that are in the record. Was his conclusion illogical? Now, on remand, the county, of course, can go back and try to demonstrate that this conclusion was wrong. They'll have a chance through discovery, just as we'll have a chance through discovery, to try to, what we'd say is call their bluff and show that indeed they have a long record of detaining individuals who post bail. Has the case gone on in the meantime? No. The county asked that the discovery be stayed pending this appeal. And so there's not been an opportunity yet. And in fact, that's what the county is trying to do, is seek a shortcut to challenge the judge's decision as if this were a final rule on a complete record. The county cites to the fact that there's no formal recitation of the findings of fact. But of course, what they're referring to is Federal Rule of Civil Procedure 52A1, when you have a final judgment. 52A3 makes very clear that on a motion like this, temporary restraining order, there's no need for those formal findings. Well, it sounds like if you want to go back and have a trial with full discovery and so forth, maybe come back to what you raised at the beginning. Is there any reason to maintain the TRO at this point in time? No. We believe the TRO is now moot. Mr. Sanchez is outside of the country. Does that make this appeal moot as well? It does. Congress has been clear about who's authorized to enforce the Federal Civil Immigration laws. And in fact, the county now disavows the authority to rely upon an I-200. The county says all they did was submit a notification. But you can't understate that this was not a notification. This was an immigration hold placed on the jail roster pursuant to Washington State law, which requires them to list the cause of confinement. The county is now trying to say that the district court erred in denying the fact and not accepting their novel interpretation of what an immigration hold is. But certainly, there's facts in the record that permit the district court to come to the conclusions that, yes, Mr. Sanchez Ochoa was at imminent risk of suffering irreparable harm absent the court's interference. And the final point I'd make is, on a 1983 action, we're not just seeking damages. That is to say, Mr. Sanchez Ochoa did not need to wait until after the axe had fallen before he came to seek relief from the court. Instead, 1983 allows for injunctive relief. So he was able to say, don't make me wait until they've held on to me for three months after I posted bail. Make sure that I can have the opportunity to post bail. And then if I post bail, that I won't be detained. And based upon the facts before the court, Judge Mendoza correctly determined that Mr. Sanchez was entitled to a temporary injunctive relief. All right. Thank you, counsel. You've exceeded your time. Rebuttal. Thank you, Your Honors. I'm a little bit taken aback by the mootness point that counsel has made because page 37 footnote 14 of the response brief, Sanchez Ochoa states that he does not believe that, in fact, does not concede whether the issue is moot because this may very well fulfill the capable of repetition yet evading review prong that would justify deeming it not moot. Would you object to a mootness determination by this court? Your Honor, it's very difficult to say because the problem is that there is a state court order in the record at ER 145 that directs ICE to return Mr. Sanchez Ochoa back to Yakima County after he fulfills whatever his ICE detention may be. I don't think this can be simply mooted out of existence. Even if he's been deported? Well, Your Honor, we don't know that right now. And the problem is that when he returns back to Yakima County. If he returns back. Granted, Your Honor, if he returns back, the TRO is reengaged with full force. But furthermore, Your Honor, we're not so confident. In fact, we're very concerned that the scope of the TRO is not limited to Mr. Sanchez Ochoa. And we've been very deferential to Judge Mendoza's apparent intent behind the TRO to preclude it from allowing us to do any kind of in-custody transfer of any person who may be in Yakima County DOC custody, but who may also then have a perfectly lawful ICE warrant issued against them. Well, if we would decide that it's moot and vacate the TRO, then. Okay. So, I mean, that's what, I guess, I don't know that we're going there because mootness, I guess I'd had the same impression. Mootness was off the table and I hadn't really thought about it. But if, would you have an objection if that's the route we took, including vacating the TRO? You know, I'd appreciate, Your Honors, if you would give us a little bit of the Ninth Circuit's best understanding. We're all a moving target here. But no, you're right. I don't know what more we could hope to achieve other than ultimately the remedy of vacating the TRO. But I would like to also respond to a question that Judge Freidenthal made, because I think it was a key issue. Your Honor asked, the reality was, in fact, Mr. Sanchez Ochoa could not post bail. I took it you were quite concerned about that. I'm not so sure I agree with that. But the question for Fourth Amendment analysis is, well, why couldn't he? Why couldn't he? Was he unable to post bail because of something the Yakima County Department of Corrections did? There's nothing in the record that says that. Well, on a but-for level, you seem to have acknowledged before. At a but-for level, I understand they've got a causal explanation. But-for is not going to get us to Hodari D. It's not going to get us to Al Nasser. It's not going to get us to Inyo. Brower versus Inyo. It's not going to get us to Nelson B. Davis. And if you only have but-for, then you're really plugged into the Mendia case. You're really plugged into nothing more than establishing Article III standing. We know that from Novak, Judge Clifton's recent decision. I'm out of time, Your Honors. Thank you very much. Thank you. Thank you to all counsel for your helpful arguments in this case. The case just argued is submitted for decision by the court. That completes our calendar for this morning. And for the week, we are adjourned.
judges: Rawlinson, Clifton, Freudenthal